**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

**Dianna L. Wintermute,**

    *Plaintiff,*

**v.**                                                                   **Case No.  3:06-cv-224**
                                                                   **Judge Thomas M. Rose**

**The Guardian, et al.,**

    *Defendants.*

---

**ENTRY AND ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (Doc. 14), AND DENYING PLAINTIFF'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (Doc. 15).**

---

       This is a claim for benefits arising under the Employee Retirement Income Security Act, 29 U.S.C. § 1001, et seq. ("ERISA").  The Plaintiff in this case is Dianna Wintermute, a former employee of Defendant Enginetics Aerospace Corporation ("Enginetics").  Wintermute was a Management Information Systems Technical Supervisor for Enginetics.  She stopped working for Enginetics in 2001, at which time she claimed to be disabled.  She received short-term disability benefits for approximately five months, after which she began receiving long-term disability ("LTD") benefits pursuant to an LTD Plan administered and sponsored by Enginetics and offered by Defendant The Guardian ("Guardian").  On October 19, 2004, the Guardian terminated Wintermute's benefits.  Soon thereafter, Wintermute appealed the decision.  On July 19, 2005, Wintermute's appeal was denied.

A copy of the administrative record has been filed with the Court manually under seal and the parties have filed cross-motions for judgment with respect thereto. Doc. 14 (captioned Defendants' Motion for Judgment on the Administrative Record); Doc. 15 (captioned Plaintiff's Motion for Judgment on the Administrative Record).  Herein, the Court will set forth its findings of fact, opinion, and conclusions of law.

## I.    Findings of Fact[1]

Insured employees of Enginetics were provided with a document entitled "Your Group Insurance Plan (the "plan summary"), which describes Enginetic's disability insurance policy with Guardian (the "policy"). (AR 935-1038).  The plan summary states that "The Plan Administrator has discretionary authority to determine eligibility for benefits and to construe the terms of the *plan* with respect to claims."  (AR 998) (emphasis in original).  The policy states that "Guardian is the Claims Fiduciary with discretionary authority to determine eligibility for benefits and to construe the terms of the plan with respect to claims." (AR 1035).  Under the terms of the plan summary and the policy, an insured's LTD benefits end on "(a) the date he earns at a rate of at least 80% of his indexed prior monthly earnings; or (b) the date we determine he is able to perform all of the material duties of his regular occupation on a full-time basis, even if he chooses not to." (AR 921, 1026).

Wintermute began employment with Enginetics in 1998 as a Management Information

---

[1] The administrative record consists of more than 1,300 numbered pages. The Court will refer to such as "AR [page #]."

Systems Technical Supervisor, which she maintained throughout her employment. (AR 155). As MIS Technical Supervisor, she was responsible for monitoring network and mainframe activities. Her job has been classified as requiring "light" strength. (AR 160). It required her to use hands for simple grasping and fine manipulation and to operate and type on computers. (AR 155-57). It did not require her to "bend/stoop, climb, reach above shoulder level, kneel, balance, push/pull, squat, crawl, crouch, lift, carry, or use her feet for repetitive motion." (AR 155).

On July 6, 2001, Wintermute began receiving LTD benefits under the policy. (AR 1046). She had complained of tiredness and was diagnosed at that time with fatigue, depression, allergies, erythema nodosum (a skin disease involving inflammation of fat cells under the skin), diabetes, and obesity. (AR 125).

On May 22, 2003, Guardian transferred administration of this claim to ClaimSource, an external service provider of claims management. (AR 296, 326). The reason for the transfer is not completely clear, but in a letter to Wintermute in June 2003, Guardian explained that "[p]eriodically, in the administration of our claims, Guardian utilizes the expertise of external providers of services. ClaimSource ... is one of those external service providers." (AR 326).

On June 25, 2004, ClaimSource referred Wintermute to Dr. Randolph, an infectious disease specialist and independent medical examiner. (AR 468-76). Dr. Randolph examined Wintermute and issued a report, which concluded that Wintermute was able to return to work. (Id.) In his report, Dr. Randolph commented that Wintermute's medical records contained very little information regarding physical examinations of Wintermute. (Id.) ClaimSource sent Dr.

Randolph's report to three physicians: (1) Dr. Burton, an internal medicine and pulmonology specialist; (2) Dr. Chapman, who is Wintermute's family physician, and (3) Dr. Blackman, an endocrinologist.  Dr. Chapman agreed with Dr. Randolph's findings, while Drs. Burton and Blackman disagreed, finding Wintermute unable to return to work. (AR 535, 1345, 570).

On August 10, 2004, a Vocational Assessment concluded that Wintermute could return to work.  (AR 511-15).  The assessment appears to have relied solely on Dr. Randolph's opinion.  (AR 518).  On October 19, 2004, ClaimSource denied continuing benefits to Wintermute.  (AR 1136).  On October 24, 2004, Wintermute advised ClaimSource of her intent to appeal.  (AR 1318).

On January 5, 2005, Dr. Valle, a neurologist, conducted an electromyography test ("EMG") to assess Wintermute's medical condition.  (AR 1127).  Dr. Valle concluded that the test was consistent with "myotonic dystrophy."  (AR 1132-33).  Myotonic Dystrophy is a hereditary disease characterized by weakness and stiff muscles. *The Merck Manual of Medical Information*, 412-14 (2003).  The most severe form of the disorder involves extreme muscle weakness as well as other symptoms including cataracts and diabetes.  (Id.)  Dr. Valle did not comment on Wintermute's ability to work. (AR 1132-33).

ClaimSource next referred Wintermute's file to two more physicians: (1) Dr. Mitzer, an endocrinologist; and (2) Dr. Jares, a neurologist.  (AR 1083-84).   Dr. Mitzner declined to comment on Dr. Valle's findings, noting that review of the EMG test "should be and would be better addressed by a neurologist."  (AR 1268).  The neurologist, Dr. Jares, agreed that the records support a clinical diagnosis of myotonic dystrophy.  (AR 1119).  He noted that myotonic dystrophy was likely present prior to October 31, 2004, but that she could work a sedentary job

-4-

during that time. He also concluded that Wintermute could not work a sedentary job after October 31, 2004. (Id.)

ClaimSource submitted Dr. Jares' report to Dr. Randolph and Dr. Stevens, an endocrinologist. Dr. Randolph concluded that had he known about Wintermute's fatigue and myotonic dystrophy at the time of his first IME in June 2004, his opinion that she could return to work would not have changed. (AR 1098). Dr. Stevens concluded that "no weight can be placed on [Dr. Jares'] opinion" because he provided no objective rationale to support his conclusions. (AR 1094). On July 19, 2005, ClaimSource denied Wintermute's appeal, concluding that she could perform her own occupation on October 19, 2004. (AR 1078-87).

Wintermute applied for social security benefits. Her claim was initially denied and again denied on reconsideration. (AR 1191-93). Wintermute has further appealed this decision, which the administrative record reflects as currently pending. (AR 1161). The record does not indicate whether Wintermute resigned from employment with Enginetics or whether she was terminated.

**II.     Opinion**

In reviewing a decision to deny ERISA plan benefits, the Court must first determine the appropriate standard of review, and then, subject to the constraints of that standard, determine whether it can be said that the administrator's decision was made in error. The Court will discuss these questions in turn.

A.     Standard of Review

Wintermute argues that this Court should apply a *de novo* standard of review, while Defendants assert that an "arbitrary and capricious" standard of review is appropriate. In reviewing a denial of benefits under an ERISA-governed plan, the district court applies a *de*

*novo* standard unless the plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000). Since the arbitrary and capricious standard is the exception and not the rule, there must be a clear grant of discretion to determine benefits or interpret the plan. *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1373 (6th Cir. 1994).

In determining whether there has been a clear grant of discretion, courts look to the governing language in the documents which were actually provided to the employee, such as a plan summary. *Willis v. ITT Educ. Servs.*, 254 F. Supp. 2d 926, 933 (S.D. Ohio 2003). Where language in the plan summary conflicts with or contradicts language in the policy, the plan summary language controls, particularly where the employee received only the plan summary. *Haus v. Bechtel Jacobs Co., LLC*, 491 F.3d 557, 564 (6th Cir. 2007). However, plan summary language that is "merely ambiguous should not be permitted to trump unambiguous language in the [policy] itself." *Bolone v. TRW Sterling Plant Pension Plan*, 130 Fed. Appx. 761, 766 (6th Cir. 2005) (quoting *Lake v. Metro. Life Ins. Co.*, 73 F.3d 1372, 1379 (6th Cir. 1996)).

In the instant case, the plan summary grants discretionary authority to the "Plan Administrator," a term that is undefined in the plan summary. (AR 998). Thus, the term "Plan Administrator" is ambiguous. The policy, however, unambiguously grants discretionary authority to Guardian. (AR 1035) ("Guardian is the Claims Fiduciary with discretionary authority to determine eligibility for benefits and to construe the terms of the plan with respect to claims."). Since the policy unambiguously grants discretionary authority to Guardian, this language trumps the unambiguous language in the plan summary. Thus, decisions made by

Guardian to terminate disability benefits receive the arbitrary and capricious standard.

In the instant case, however, Guardian did not make the decision to terminate benefits; rather, ClaimSource made the decision. (AR 1136). When the decision is made by "an unauthorized body that does not have fiduciary discretion to determine benefits eligibility," arbitrary and capricious review "is not warranted." *Sanford v. Harvard Indus.*, 262 F.3d 590, 597 (6th Cir. 2001). Neither the policy nor the plan summary grants ClaimSource discretionary authority to determine eligibility benefits. Nor do they authorize Guardian to delegate its decision-making authority to a third party. See *Lee v. MBNA Long Term Disability & Benefit Plan*, 136 F. Appx. 734, 742 (6th Cir. 2005) ("an ERISA fiduciary may delegate its fiduciary responsibilities to either another named fiduciary or a third party if the plan establishes procedures for such delegation."). The language Guardian refers to the Court, Doc. 16, citing AR 1017 and 914, does not establish such a procedure. Therefore, since ClaimSource is an unauthorized body without discretionary authority to terminate benefits under the plan, its decision to terminate Wintermute's disability benefits receives *de novo* review.

When applying the *de novo* standard of review, this Court must determine whether the decision was a correct decision without according the decision-maker "a presumption of correctness or deference." *Perry v. Simplicity Eng'g*, 900 F.2d 963, 965 (6th Cir. 1995). The Court's primary goal in this situation is "to give effect to the intent of the parties as expressed by the language of the ERISA plan." *Boyer v. Douglas Components Corp.*, 986 F.2d 999, 1005 (6th Cir. 1993). The Court is free to draw on its own inferences and legal conclusions based on the records relied on in the initial decision and the appeal, so long as they are contained within the administrative record. *Perry*, 900 F.2d at 966. If this Court were permitted to receive and

consider evidence not presented to the decision-maker at the time of its decisions, this Court would essentially play the role of "substitute plan administrator," which was not intended by Congress when enacting ERISA. *Id.* at 966-67.

  B. Application of *De Novo* Review

Whether Wintermute was disabled on October 19, 2004 hinges upon the definition of "disability" in the plan summary and policy. In other words, this Court must determine whether she could "perform all of the material duties of [her] regular occupation on a full-time basis due to sickness or injury" and her "current monthly earnings, if any, [were], solely due to [her] disability less than 80% of [her] indexed prior monthly earnings." (AR 983). Since Wintermute did not work while she was receiving disability benefits, the only issue is whether she could perform all of the material duties of her regular occupation as an MIS Technical Supervisor. Wintermute is not required to prove she was disabled due to some particular diagnosis; rather, she must prove she was disabled under the definition in the plan summary and policy. *Roschow v. Life Ins. Co. of N. Am.*, 482 F.3d 860, 865 (6th Cir. 2007). In *Roschow*, the Court examined the medical evidence in the record and held that it was inconclusive whether the plaintiff was disabled. *Id.* at 866. Thus, while no particular diagnosis is required to establish disability, the medical evidence surrounding a diagnosis may be used in determining a plaintiff's abilities.

An independent medical examiner, Dr. Randolph, examined Wintermute in June 2004. (AR 468). He conducted a physical examination and concluded that Wintermute was able to return to work. (AR 474-75). He explained that her subjective complaints were not objectively verifiable. (Id.) Wintermute's personal physician, Dr. Chapman, agreed with Dr. Randolph's IME report. (AR 535). A vocational assessment issued in August 2004 concludes that

-8-

Wintermute can return to work. (AR 511-15). It should be noted that the vocational assessment appears to be based solely on Dr. Randolph's report. (AR 511).

In December 2002, Dr. Blackman, an endocrinologist, examined Wintermute and concluded that she had diabetes with multiple complications. (AR 684-85). At her August 2004 examination, Dr. Blackman concluded that Wintermute was not able to return to work due to her diabetes and visual difficulties. (AR 1345). However, when ClaimSource asked Dr. Blackman to provide further information regarding Wintermute's condition in September 2004, Dr. Blackman did not respond. (AR 1147). Moreover, another endocrinologist, Dr. Mitzner, later evaluated Wintermute and concluded that there was "no objective evidence provided that her diabetes affects" her ability to "climb, kneel, squat, crouch, bend/stoop, etc." as required by her job. (AR 1107-08).

Dr. Burton, who specializes in internal medicine and pulmonology, treated Wintermute extensively regarding her fatigue. Dr. Burton performed several sleep studies and prescribed medications for fibromyalgia. (AR 350, 628, 1125). He also prescribed the use of a "CPAP mask," a respiratory ventilation system to be used at home during sleep to treat sleep apnea. (AR 1124). Although Wintermute asserts that the CPAP mask did not help her, Dr. Burton noted that a CPAP study did reduce her apneic index, indicating that a CPAP treatment would help her sleep apnea. (AR 1122-23). Dr. Burton then prescribed a CPAP treatment for Wintermute. (Id.)

On January 5, 2005, Dr. Valle, a neurologist, diagnosed Wintermute with myotonic dystrophy, a form of muscular dystrophy. (AR 1127-28). However, Dr. Valle did not comment on whether Wintermute was capable of performing her job. (Id.) Dr. Jares, another neurologist,

confirmed the diagnosis of myotonic dystrophy. (AR 1109-10). Regarding whether Wintermute was capable of performing her job, Dr. Jares concluded from his vantage point in 2005 that Wintermute could work a sedentary job prior to October 31, 2004, but could not work a sedentary job after October 31, 2004 due to her myotonic dystrophy. (AR 1110).

Both Wintermute and Guardian attempt to discredit Dr. Jares' opinion. Wintermute argues that even though Dr. Jares is the only physician "technically competent to opine about Wintermute's myotonic dystrophy," his opinion is not credible because he has an anti-claimant bias. (Doc. 15 at p. 15). She rests her argument on the fact that Dr. Jares concluded that she was not disabled until sometime after October 31, 2004 when her date of termination of benefits was October 19, 2004, noting that this timing is "beyond coincidence." (Id.). Guardian argues that Dr. Jares' opinion should not be relied upon because it "relied upon nothing more than [the] diagnosis" of myotonic dystrophy. (Doc. 14 at p. 15). It is the view of this Court that, as a neurologist, Dr. Jares was especially suited to evaluate Wintermute with respect to myotonic dystrophy. Moreover, his conclusion that she could perform her job up to a certain time, but not after that time, is not without a valid basis. Since myotonic dystrophy involves the slow deterioration of muscles, it is plausible that a person with such a condition could perform some activities for a time, but then come to a point when she would be unable to perform those same activities. Thus, Dr. Jares' conclusion that she could work a sedentary job on October 19, 2004 is not insignificant or uncredible.

In January 2005, Dr. Chapman, who had previously agreed with Dr. Randolph's assessment that Wintermute was able to return to work, concluded that Wintermute was unable to work "at this time." (AR 1135). She appears to base her conclusion on the opinions of Drs.

-10-

Burton and Blackman and Dr. Valle's diagnosis of myotonic dystrophy. (Id.). However, Dr. Chapman's change of opinion can be discounted for a couple of reasons. First, Dr. Chapman concludes that Wintermute is unable to work "at this time," referring to January 2005; the issue is whether Wintermute was unable to work on October 19, 2004. Second, Dr. Chapman's change of opinion is not based upon any new data. *Raskin v. Provident Corp.*, 121 Fed.Appx. 96 (6th Cir. 2005) (doctor's change of recommendation discounted because the doctor did not base her change of opinion on any new data). Dr. Chapman did not reexamine Wintermute and the opinions of Drs. Burton and Blackman were available to her when she issued her initial opinion that Wintermute could return to work. Thus, the only new medical information underlying her change in opinion was the diagnosis of myotonic dystrophy; she did not refer to any changes in Wintermute's physical capacity to perform her occupational functions.

Upon consideration of the foregoing medical evidence in the record, this Court concludes that Wintermute was not disabled on October 19, 2004. Although it appears that Wintermute suffers from myotonic dystrophy, the evidence in the record does not support the conclusion that this disease prevented Wintermute from performing the material duties of her occupation at the time that ClaimSource denied her benefits.

    C.  Other Potential Factors in Determining Whether an Employee is Disabled

This Court may also rely on a couple of other factors in determining whether someone is disabled. First, a determination made by the Social Security Administration concerning whether the plaintiff is entitled to social security benefits is not "meaningless;" rather, some weight may be given to this determination. *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 294 (6th Cir. 2005). In the instant case, Wintermute's application for social security benefits claim was initially

denied. On reconsideration, her application was again denied. (AR 1191-93). A further appeal of this decision is now pending. (AR 1161). While this points in favor of the Court's conclusion, the conclusion would stand without resort to this inference.

Second, Wintermute's disability policy requires her to stay under a doctor's regular care for the cause of disability. (AR 985). The administrative record contains very few medical reports dated 2004, the year ClaimSource terminated Wintermute's benefits. In June 2004, Dr. Randolph noted in his report that Wintermute's medical records contained very little information regarding physical examinations of Wintermute. (AR 468-76). It appears that Wintermute failed to stay under a doctor's regular care for the cause of her disability. This factor would also independently allow a cessation of benefits.

### D. Wintermute's Procedural Arguments

Wintermute presents three claims of procedural deficiency during the administrative process. Doc. 15 at pp. 9-11. First, Wintermute claims that ClaimSource's failure to give Wintermute all of the relevant documents violated her right to full and fair review under ERISA. Doc. 15 at p. 9; 29 C.F.R. § 2560.503-1(h)(2)(iii). However, unless the plaintiff alleges how such a violation has prejudiced her presentation of her case, there is no procedural violation. *Rose v. Meijer Long-Term Disability Plan*, 2007 U.S. Dist LEXIS 4428 at *17 (W.D. Mich. Jan. 22, 2007) (citing *Bartling v. Fruehauf*, 29 F.3d 1062, 1068 (6th Cir. 1994) (explaining that Courts may consider whether plaintiff has been prejudiced in determining whether penalties for such violations are warranted)). Since Plaintiff does not allege that she was prejudiced as a result of not receiving certain documents, there is no procedural violation.

Second, Wintermute also claims that she had the right to have her claim reviewed by

physicians who have "appropriate training and experience in the field of medicine involved in the medical judgment." Doc. 15 at p. 10; 29 C.F.R. § 2560.503-1(h)(3)(iii). Specifically, Wintermute claims that since myotonic dystrophy is a neurological disease, Drs. Randolph and Stevens (an infectious disease specialist and endocrinologist, respectively) were not qualified to render an opinion regarding Wintermute's condition. Doc. 15 at p. 10. However, review by Drs. Randolph, Stevens, and the other non-neurologist physicians was appropriate because Wintermute was not diagnosed with myotonic dystrophy until after the initial termination of her benefits. Before that time, she had been diagnosed with several other conditions such as fatigue, fibromyalgia, and diabetes. After Dr. Valle diagnosed Wintermute with myotonic dystrophy, ClaimSource had Dr. Jares (a neurologist) review Dr. Valle's findings. Thus, ClaimSource's reliance on Drs. Randolph and Stevens was appropriate.

Finally, Wintermute claims that ClaimSource's reliance on Drs. Randolph and Stevens for both the initial denial of benefits and the appeal process violated her right to full and fair review under ERISA. Doc. 15 at pp. 10-11; 29 C.F.R. § 2560.503-1(h)(3)(v) ("the health care professional engaged [on appeal] shall be an individual who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual."). While ClaimSource did rely on Drs. Randolph and Stevens during the initial and appellate reviews, it also consulted with new physicians in the appeal process: Drs. Jares and Mitzner. While the plain meaning of the regulation's text does not clearly indicate whether <u>all</u> physicians consulted during the appeal process must be new physicians, or whether at least one new physician will suffice, this Court holds that ClaimSource's conduct was proper. See e.g. *Kaiser v. Sandard Ins. Co.*, 2007 U.S. Dist. LEXIS

2239 at **15-16 (N.D. Cal. Jan. 11, 2007) (review by one new physician is sufficient to satisfy 29 C.F.R. § 2560.503-1(h)(3)(v)); *Chatterton v. IHC Health Plans, Inc.*, 2006 U.S. Dist. LEXIS 26393 at *14 (Dist. Utah Apr. 20, 2006) (Plan Administrator substantially complied with the regulation even though one physician was consulted during both the initial and appellate reviews when new physicians were consulted on appeal as well).

### III.    Conclusions

The policy at issue granted Guardian, as plan fiduciary, discretionary authority to determine a claimant's eligibility for benefits.  The policy did not grant ClaimSource discretionary authority to determine a claimant's eligibility for benefits.  The policy did not authorize Guardian to delegate its discretionary authority.  The proper standard of review of ClaimSource's decision to deny permanent LTD benefits to Wintermute is the *de novo* standard of review.  On October 19, 2004, Wintermute was not "disabled" as defined by the policy disability insurance between Enginetics and Guardian.  There were no procedural defects in ClaimSource's initial or appellate denial of Wintermute's benefits.

Based on the foregoing, Defendants' Motion for Judgment on the Administrative Record (Doc. 14) is GRANTED and Plaintiff Wintermute's Cross-Motion for Judgment on same (Doc. 15) is DENIED.

**DONE** and **ORDERED** in Dayton, Ohio, Tuesday, November 27, 2007.[2]

s/Thomas M. Rose

---

[2] The Court acknowledges the valuable contribution and assistance of judicial intern Christopher E. Cotter in drafting this opinion.

                                                                                                                       _____

                                                                                                                                     THOMAS M. ROSE

                                                                                            UNITED STATES DISTRICT JUDGE